An appropriate order follows.

**In re MICROSOFT CORP. ANTITRUST LITIGATION.**

MDL 1332.

United States District Court,
D. Maryland.

April 14, 2003.

## OPINION

MOTZ, District Judge.

A series of actions have been filed in various federal and state district courts on behalf of consumers of Microsoft software products seeking monetary and injunctive relief for harms the plaintiffs allegedly have suffered as the result of Microsoft's violations of federal and state antitrust laws. The actions filed in, or removed to, federal district courts were transferred to this district by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407, on April 25, 2000. After the transfers, plaintiffs instituted here a consolidated amended complaint, asserting all of their federal claims.[1]

I have previously ruled that the *Illinois Brick* rule bars persons who purchased licenses for Microsoft software through original equipment manufacturers or other intermediaries from recovering monetary damages against Microsoft on their federal antitrust claims. *See In re Microsoft Corp. Antitrust Litig.*, 127 F.Supp.2d 702, 708–13 (D.Md.2001). I also declined to give preliminary approval to a nationwide settlement of consumer claims proposed by the plaintiffs in the MDL proceedings and Microsoft. *See generally In re Microsoft Corp. Antitrust Litig.*, 185 F.Supp.2d 519 (D.Md.2002).

Presently pending is a motion for class certification filed by plaintiffs.[2] The motion

1. The MDL proceeding has since been expanded to include antitrust actions filed against Microsoft by four of its competitors.

2. Unfortunately, my ruling on the motion has been substantially delayed because of the shifting tactical decisions made by plaintiffs since the motion was filed.

presents the following six questions (with my short answers stated in bold):

(1) May purchasers of licenses for operating system software be class representatives for purchasers of licenses for applications software? **No.**

(2) If not, is a newly added plaintiff (a sister-in-law of one of the plaintiffs' attorneys who purchased software at a deeply discounted price) an adequate class representative for purchasers of licenses for applications software? **No.**

(3) Are "Select" and "Enterprise" customers who purchased software licenses through "Large Account Resellers" proper members of the requested class? **No.**

(4) Are Enterprise customers who purchased licenses for a large volume of software products directly from Microsoft proper members of a class represented by individuals who purchased single licenses for operating system software through a program known as shop.microsoft.com? **No.**

(5) Are the requirements of Rules 23(a) and (b)(3) met as to a monetary damages class composed of purchasers of licenses for operating system software through shop.microsoft.com? **Yes.**

(6) Should an injunctive relief class be certified? **No.**

## I.

When they originally filed their class certification motion, plaintiffs sought to represent four classes, two of which encompassed purchasers of licenses for Windows operating systems software and two of which were composed of purchasers of Microsoft Office software. The proposed injunctive classes were defined as follows:

1. Operating Systems Software Class: "All persons and entities who acquired a license in the United States from Microsoft, an agent of Microsoft, or an entity under Microsoft's control, for an Intel-compatible PC version of MS–DOS, Windows 95, upgrades to higher MS–DOS versions, upgrades to or of Windows 95, Windows 98, upgrades to or of Windows 98, or other software products in which MS–DOS or Windows has been incorporated in full or part ('Microsoft Operating System Software') at any time during the Class Period ('Microsoft Operating System Class')."

2. Office Software Class: "All persons and entities who acquired a license in the United States from Microsoft, an agent of Microsoft, or an entity under Microsoft's control for an Intel-compatible PC version of Microsoft Office or any upgrade of Microsoft Office at any time during the class period ('Office Suite Applications Software Class')."

The proposed damages classes were defined as follows:

3. Operating Systems Software Class: "All persons and entities who acquired a license in the United States, other than for resale or relicensing, for Microsoft single user operating system software, including upgrades, compatible with x86 personal computers, at a price determined by Microsoft."

4. Office Software Class: "All persons and entities who acquired a license in the United States, other than for resale or relicensing, for Microsoft Office software, including upgrades, compatible with x86 personal computers, at a price determined by Microsoft."

The class certification motion was thoroughly briefed, and an oral argument held for several hours on October 1, 2002. At the conclusion of the oral argument, plaintiffs announced they had just decided to redefine the proposed classes by collapsing the two monetary damages classes into a single monetary damages class and the two injunctive classes into a single injunctive class. Thereafter, plaintiffs filed a "Notice of Amendment to Proposed Class Definitions" in which they defined the proposed new injunctive class as:

All persons and entities who acquired a license in the United States, other than for resale or re-licensing, for Microsoft single-user operating system software, Microsoft Word software (either as a stand-alone produce or as part of the Microsoft Office suite), or Microsoft Excel software (either as a stand-alone product or as part of the Microsoft Office suite), including upgrades, compatible with x86 personal computers.

The plaintiffs defined the proposed new damages class as:

All persons and entities who acquired a license in the United States, other than for resale or re-licensing, for Microsoft single-user operating system software, Microsoft Word software (either as a stand-alone product or as part of the Microsoft Office suite), or Microsoft Excel software (either as a stand-alone product or as part of the Microsoft Office suite), including upgrades, compatible with x86 computers, at a price determined by Microsoft.[3]

■ The reason plaintiffs changed their position is clear. When plaintiffs filed their motion for class certification, there were three class representatives: Franklin J. De-Julius, Paul A. Dieter, and Gary L. Leach. Each of these plaintiffs purchased licenses for Windows operating system software during the class period directly from Microsoft pursuant to a program known as shop.microsoft.com. None of them, however, purchased Office, Word, or Excel directly from Microsoft during the class period. Therefore, they clearly cannot represent a separately defined class of purchasers of licenses for applications software. Instead, plaintiffs now assert that because of the alleged interrelationship between Microsoft's alleged monopolies in the operating system and application markets, the two markets should be conjoined for class certification purposes.

Plaintiffs' position is without merit. One of the requirements for class certification set forth in Fed.R.Civ.P. 23(a) is that the claims of the class representatives be typical of the claims of the class. Operating system software is a different product from applications software, and the purchase of a license for one is not the purchase of a license for another. Plaintiffs have alleged from the outset of these proceedings that Microsoft has monopolies in different markets, and their experts continue to opine that there are three distinct antitrust markets relevant to this action: the operating system software market, the word processing application software market, and the spreadsheet application software market. The liability and damage issues presented by claims arising out of these separate markets are not the same, and the claims of any plaintiff who has made a purchase in one of the markets cannot be said to be typical of the claims of a plaintiff who has made a purchase in one of the other markets. *See, e.g., Prado–Steiman v. Bush,* 221 F.3d 1266, 1279 (11th Cir.2000); *In re Oxford Health Plans, Inc. Sec. Litig.,* 199 F.R.D. 119, 123 (S.D.N.Y.2001). Therefore, DeJulius, Dieter, and Leach may only represent purchasers of licenses for Windows operating systems during the class period.

## II.

■ After the supplemental briefing prompted by plaintiffs' modification of their class definitions had been completed (and on the very eve of my issuance of an opinion), plaintiffs again shifted their position, filing a notice naming Rhoda Henning as an additional class representative. Henning, an employee of the Ford Motor Company, purchased a license for Microsoft's Office 2000 Upgrade directly from the shop.microsoft.com website on December 6, 2000, at a discounted price pursuant to a program that Microsoft was offering to its largest volume licensees for the personal benefit of their employees.

Henning is the sister-in-law of one of the attorneys for the plaintiffs. This is not the first occasion on which she has attempted to serve as a class representative in one of her brother-in-law's cases. In 1999, he filed an antitrust action on her behalf in *Rhoda Henning v. Nine West, Inc.,* No. 99 Civ 3721, in the Southern District of New York. According to Henning's deposition testimony, she knows nothing about the proceedings in that case or its outcome. (Henning Dep. at 26–30.)

Some courts have permitted relatives of plaintiffs' counsel to serve as class representatives. *See, e.g., Lewis v. Goldsmith,* 95 F.R.D. 15, 20 (D.N.J.1982); *Fischer v. Int'l Tel. & Tel. Corp.,* 72 F.R.D. 170, 173 (E.D.N.Y.1976). Other courts, however, have refused to do so on the ground that the relative cannot fairly and adequately represent the class under circumstances giving rise to an apparent conflict of interest. *See, e.g., Zlotnick v. TIE Communications, Inc.,* 123 F.R.D. 189, 193–94 (E.D.Pa.1988); *Kirby*

---

**3.** The parties spar over whether plaintiffs can seek to redefine their proposed classes by filing a notice or whether they are required to file a motion. However, Microsoft has not objected to my considering whether the two new proposed classes are appropriate for certification.

*v. Cullinet Software, Inc.,* 116 F.R.D. 303, 308–10 (D.Mass.1987). I am fully persuaded the latter is the case here. Plaintiffs' various tactical maneuvers in identifying new class representatives and redefining the proposed classes they seek to represent reflect that they view this litigation as a chess game in which the lawyers, not their clients, are the players. Henning is merely a pawn, and I find that she would not represent the class fairly and adequately.

### III.

■ I will next consider whether "Select" and "Enterprise" customers who purchased software licenses through "Large Account Resellers" may be included in the class represented by DeJulius, Dieter, and Leach.

As I have previously ruled, *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), bars any claim for monetary damages under the Sherman Act by a person who did not purchase a software license directly from Microsoft. *See In re Microsoft,* 127 F.Supp.2d at 708–13. Plaintiffs' proposed monetary damages classes are not limited to direct purchasers of licenses for Microsoft software; rather, the classes are defined to include all persons who acquired licenses for Microsoft software "at a price determined by Microsoft." The reason for this broader definition is to include within the classes so called "Select" and "Enterprise" customers who purchased licenses from software through Large Account Resellers ("LARs").

Plaintiffs contend that *Illinois Brick* does not apply to Select and Enterprise customers because the LARs are merely agents of Microsoft (not distinct entrepreneurial entities) and because the prices they charge are determined by Microsoft. To the extent that plaintiffs seek to create a new "agency" exception to the *Illinois Brick* rule, focusing on legal status rather than economic realities, their efforts are unavailing for the reasons I stated in my earlier opinion ruling on Microsoft's motion to dismiss. In any event, plaintiffs' allegations that LARs are Microsoft's agents and that Microsoft determines the prices they charge are incorrect.

LARs are independent companies that sell Microsoft software along with other vendors' products and services to large volume customers. Some LARs bundle with the software products they supply technical services they provide to their customers. LARs include prominent original equipment manufacturers, such as Dell and Hewlett Packard. Microsoft does not have an ownership interest in any LAR. The agreements between Microsoft and LARs expressly disclaim any agency relationship.

The agreements also provide that "LAR shall have complete discretion to establish the pricing and all other terms and conditions regarding ... the provision of" products. Further, the agreements posit that "the negotiation of these terms ... shall not be subject to approval or review by Microsoft in any way." Affidavits from officers of numerous LARs, as well as Microsoft personnel, establish that these provisions are strictly complied with in practice. Each LAR determines what price to charge its customers without input from Microsoft.[4] The LARs are free to negotiate extended credit terms with their customers (although the LARs are bound to pay Microsoft for products they receive within 30 days of invoicing), and they bear the risk of loss if their customers fail to pay.[5]

---

4. Plaintiffs point to language in Microsoft's Enterprise Agreement Pricing Tool Information Sheet that "[a]fter the customer has selected a Large Account Reseller and negotiated the final pricing with Microsoft and their Large Account Reseller" as evidencing that Microsoft actually is involved in the setting of the final price. The affidavits submitted by Microsoft establish that this phrase refers only to the fact that Microsoft provides a "reference price" to the customer, based upon the type and volume of products involved. The LAR negotiates its own price with the customer from this reference price.

   Other isolated language in the Information Sheet and Enterprise Agreement training materials cited by plaintiffs likewise is insufficient to overcome the uncontradicted testimonial record that Microsoft is not involved in setting the final price with LARs' customers.

5. Plaintiffs argue that in fact Microsoft bears the risk of nonpayment by LAR customers. Plaintiffs cite a recent addendum to the LAR agreement under which an LAR is excused from its payment to Microsoft for a delinquent Enterprise customer if, but only if: (1) the customer defaults on its payments for more than 90 days; (2) the LAR provides written notice identifying its customer and the amount due; (3) the customer certifies its inability to pay; and (4) Microsoft decides to

In short, the record establishes that LARs do not simply pass through to their customers a price for software set by Microsoft. Therefore, their customers are barred by *Illinois Brick* from asserting claims against Microsoft for monetary damages. They cannot be included within a monetary damages class.

## IV.

■ Since October 19, 2001, Enterprise customers have purchased software licenses directly from Microsoft. Their claims therefore are not barred by *Illinois Brick*. Nevertheless, I find that post-October 19, 2001 Enterprise customers should not be included in the class plaintiffs seek to certify. The class representatives are individuals who only acquired licenses for Microsoft operating system software through the shop.microsoft.com program. Their claims are atypical of post-October 19, 2001 Enterprise customers who are large volume purchasers of licenses of a myriad of software products through an entirely different line of distribution within Microsoft.[6]

■ Moreover, even if I were to find that the typicality requirement is met, I would not include Enterprise customers within the proposed class. Rule 23(b)(1)(3) requires that before certifying a monetary damages class, a court must conclude "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Class action treatment certainly is warranted under this provision where (as I find to be the case in regard to shop.microsoft.com purchasers) the claims of the class members are so small that, but for class

action treatment, they would have little incentive to bring suit against an alleged wrongdoer. *See, e.g. Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (quoting *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (7th Cir.1997)). Likewise, a class action can also be a valuable management device where numerous suits involving substantial claims have been filed in different courts and involve predominant common questions. Securities fraud litigation is an example.

The present case falls in neither of these categories. Because they are large volume purchasers, Enterprise customers have substantial claims and the incentive (as well as the resources) to institute individual actions if they choose to do so.[7] Absent the filing of such actions, I am not prepared to find that any "controversy" within the meaning of Rule 23(b)(3) exists between Enterprise customers and Microsoft. It may be that Enterprise customers believe they have received fair value for what they have paid. Further, even assuming that there is a controversy between Enterprise customers and Microsoft, plaintiffs have not established that a class action, as opposed to individual actions or the give and take of commercial negotiations in the marketplace, is the superior way to resolve it. Although the line cannot always be drawn clearly, there is a qualitative distinction between using Rule 23 for its constructive and just purposes, on the one hand, and converting into a source of lawyer-driven, rather than client-driven, litigation, on the other. To preserve the distinction in this case, a plaintiff class of individual consumers should not be expanded to

terminate the customer from the Enterprise program. This provision merely creates an exception to the general rule that it is LARs who bear the risk of their customers' defaults.

**6.** Apparently anticipating my ruling regarding Enterprise customers who made direct purchases from Microsoft, and consistent with the history of this litigation, plaintiffs filed yet another motion for class certification on behalf of two new plaintiffs on December 19, 2002. In that motion, the plaintiffs seek certification of a class represented by the liquidation trustees of an original equipment manufacturer ("OEM") that "directly paid Microsoft for licenses to pre-install and sell at least Windows as part of its computers" and a second company that "through at least one sub-

sidiary ... paid Microsoft directly, in the United States, for licenses for at least Word and Excel (as part of the Office suite)." Already, plaintiffs have amended their motion for class certification of this OEM/reseller class because the trustee for the second company "no longer seeks to serve as a class representative in this litigation and has so advised Microsoft." Accordingly, the plaintiffs withdrew their request for certification of classes of Word and Excel resellers (although they did so without prejudice in case discovery reveals a relevant applications purchase by the OEM).

**7.** Their incentive is enhanced because, if they prevail, Microsoft would have to pay their attorneys' fees and costs. *See* 15 U.S.C. § 15(a).

include business customers who, through their own inaction, have evidenced a disinterest in their potential claims.[8]

## V.

The rulings I have made thus far bring me to the question whether a class composed of purchasers of licenses for operating system software through the shop.microsoft.com program meets the requirements of Rules 23(a) and (b)(3).

The record reflects that licenses for approximately 26,000 units of operating system software and 20,000 units of Microsoft Office have been purchased directly from Microsoft through shop.microsoft.com. The total revenue Microsoft received for all of these purchases is approximately $10 million. Any overcharge claims of these direct purchasers would, of course, only be a fraction of that $10 million. Further, because Messrs. DeJulius, Dieter, and Leach can represent only purchasers of licenses for operating system software, any recovery for that class would be calculated on the basis of the revenues received by Microsoft for operating systems software alone, not on its revenues from the shop.microsoft.com program in its entirety.

A class composed of persons who acquired licenses for operating system software through the shop.microsoft.com program, therefore, is dramatically smaller, both in terms of class members and potential monetary recovery, than the far broader classes that plaintiffs have proposed in these proceedings and in parallel state actions against Microsoft. Unlike the broader classes, however, I find this class to be certifiable. Although relatively small, it contains thousands of members and thus is sufficient to meet the numerosity requirement of Rule 23(a).[9] Likewise, there is no question that (1) common issues of law and fact exist, (2) the claims of the class representatives are typical of the claims of all purchasers of licenses for operating system software over shop.Microsoft.com program, and (3) class counsel have the ability and experience to represent the class adequately.

Microsoft contests none of these issues. The only substantial argument it makes against class certification of the shop.microsoft.com class is that the common questions do not predominate and that a class action is not a superior method to resolve the controversy because plaintiffs have not made a satisfactory showing that they can establish

---

**8.** My reasoning as to post-October 19, 2001 Enterprise customers would, of course, be equally applicable to pre-October 19, 2001 Enterprise customers and to Select customers even if their claims were not barred by *Illinois Brick.*

**9.** Microsoft executive, Robert Vellone, testified that less than 1% of the 400,000,000 copies of the Microsoft operating systems software that were sold during the period were sold directly by Microsoft. (Vellone Aff. ¶¶ 8–10, Pl.'s Ex. 1.) Based solely on this statement, the plaintiffs claim that nearly 4,000,000 copies of the operating system software were sold directly to consumers during the class period. For obvious reasons, this mathematical calculation presented by the plaintiffs is insufficient to establish that there were 4,000,000 direct purchasers. First, Vellone testified that *"less than 1%"* of the total copies sold were sold directly by Microsoft. Thus, the plaintiffs cannot simply rely on the 1% figure. Moreover, Vellone's testimony was not being offered by Microsoft to specifically quantify the number of direct purchasers—rather, it was offered by Microsoft to support the notion that direct sales constituted a very small portion of the total sales of operating system software.

Microsoft has submitted an affidavit from Andrew Schaefer, its senior operations manager for direct marketing campaigns, that establishes that, in fact, there have been far less than 4,000,000 purchasers of licenses through Microsoft software products by direct mail. According to Schaefer's affidavit, "between November 1, 1995, and August 31, 2001, Microsoft distributed through direct marketing campaigns about 463,000 units of Microsoft Operating Systems Software in Full Practice Product form in trial version for $8.3 million and 487,000 units of Microsoft Office Software in Full Practice Product form in trial version for approximately $20.7 million." Because, as discussed earlier in this Opinion, plaintiff's three designated class representatives acquired licenses only for operating system software, the class they seek to represent cannot include any of the direct mail purchasers of licenses for the applications Office software. Moreover, Schaefer's affidavit further establishes that some of the products distributed through " 'beta' and 'preview' versions of software products" and that they "typically could be only used for a specific period of time, were often distributed free of charge or for only a nominal charge to cover the cost of shipping and handling." In light of this fact, there is an atypicality between the licensed purchases made by plaintiffs' designated class representatives through the shop.microsoft.com program and the license purchases made through the direct market campaigns.

either the fact of injury or the amount of damages through class-wide proof. *See Windham v. American Brands, Inc.,* 565 F.2d 59, 65–66 (4th Cir.1977).[10]

■ Microsoft correctly argues that in assessing the sufficiency of plaintiffs' proffered proof for class certification purposes, I need not accept their allegations at face value and should make "at least a preliminary exploration of the merits" of their claims. *Shelton v. Pargo, Inc.,* 582 F.2d 1298, 1312–13 (4th Cir. 1978); *see also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 168–69 (3d Cir.2001); *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672 (7th Cir.2001). However, the class certification stage is not the time for a court to rule dispositively on the merits of the claims. Rather, it should "examine[ ] evidence as to *how* the class proponents intend to prevail at trial, not whether the *facts* adduced by the class proponents are susceptible to challenges by class opponents." *In re Polypropylene Carpet Antitrust Litigation,* 178 F.R.D. 603, 618 (N.D.Ga.1997) (emphasis in original). Thus, the focus must be whether plaintiffs can prove antitrust impact, not whether such impact actually occurred. *Id.* Likewise, in assessing expert testimony, the court "should assess the *type* of evidence that the class proposes to use at trial, while avoiding an assessment of the *merits* of this evidence." *Id.* at 621 (emphasis in original). In that regard, what is appropriate is inquiry into "the validity of the proposed methodology to show impact," not "the veracity or authenticity of facts to be 'plugged into' the formulas." *Id.*

■ Discovery in this case is now virtually completed, and the record is well developed as to plaintiff's proferred proof as to the fact of injury and the amount of damages they allegedly suffered. Plaintiffs have submitted the expert report of Dr. Keith Leffler who addresses both issues and opines that three different methodologies can be used to determine the prices that consumers would ·have paid for Microsoft's products if there had been no antitrust violations: comparable market yardstick, competitive margin yardstick, and violation free period yardstick. Although Microsoft contends that there are numerous deficiencies in Leffler's application of each of these methodologies, its criticisms go to the merits of his opinions and are unsuitable for consideration at the class certification stage.

## VI.

■ The final question is whether an injunctive relief class should be certified. As I indicated earlier in this opinion, my answer to this question is "no."

Under Rule 23(b)(2) an injunctive class may be certified if the four prerequisites of Rule 23(a) are satisfied and if Microsoft has acted "on grounds generally applicable to the class, thereby making appropriate final injunctive relief." Two of the four Rule 23(a) prerequisites appear to be met. The proposed injunctive class numbers in the millions, and common questions of law and fact

---

10. Microsoft also suggests that the potential recovery for each class member is too small to justify the administrative costs of a class action. However, as I indicated earlier in this opinion, *see supra* section IV, one of the legitimate purposes of class actions is to provide a mechanism for litigation of small claims that no individual plaintiff would have the incentive to bring. If a defendant has committed a substantial violation of the law, it should not be able to retain the benefits of its wrongdoing simply because it took a little bit from a lot of people. In any event, the persons who purchased operating software over shop.microsoft.com can be identified with relative ease from Microsoft's own records.

I might also note that I have inquired of the parties whether persons in a shop.microsoft.com class also are included in the classes that have been certified in any of the related state court actions. I did so because one of the subsidiary factors a court is to consider on the superiority question is "the extent and nature of any litigation concerning the controversy already commenced by ... class members." *See* Rule 23(b)(3). It appears from the parties' responses to my inquiry that most (and the largest) of the state court actions involve only indirect purchasers and therefore do not encompass claims of those who acquired licenses through the shop.microsoft.com program. It also appears that in those few cases where there may be some overlap between the classes, any difficulties can be resolved either by seeking redefinition of the classes in the state court actions to exclude persons falling in the class certified in this action or by defining the class in this action to exclude shop.microsoft.com purchasers included in the state court actions.

abound. However, two other prerequisites, typicality and adequacy of representation, are not. As to the former, DeJulius, Dieter, and Leach acquired licenses only for Microsoft operating system software and only through the shop.microsoft.com program. Their claims are therefore not typical of persons who purchased licenses for applications software through shop.microsoft.com or of purchasers of licenses for software through other channels of distribution.

As to the question of fairness and adequacy of representation, I believe I would be creating a conflict of interest—or at least an apparent conflict of interest—between the relatively small monetary damages class I am certifying and the extremely large nationwide injunctive class whose additional certification plaintiffs seek. At least some members of the monetary damages class might, as events unfold, be interested in a compromise resolution that would be acceptable to Microsoft while the injunctive class might contain members who would be willing to accept nothing less than a full range of conduct remedies that Microsoft would vigorously contest. Accommodation of these potentially conflicting interests might well prove impossible, and the class representatives (and their counsel) might be put to the choice of either not pursuing a settlement that would be in the interest of the class members with monetary claims or appearing to use the leverage provided by the nationwide injunctive class to achieve a monetary settlement that leaves some members of the injunctive class disgruntled. Accordingly, I find that DeJulius, Dieter, and Leach—the representatives of the monetary damages class—are not fair and adequate representatives of a nationwide injunctive class.

I will enter an order implementing the rulings I have made in this Opinion after conferring with counsel about the form of the order and the advisability of deferring ruling on the injunctive class certification issue.