### In re PUERTO RICAN CABOTAGE ANTITRUST LITIGATION.

### MDL No. 3:08–md–1960 (DRD).

United States District Court, D. Puerto Rico.

July 12, 2010.

---

*OPINION AND ORDER*

DANIEL R. DOMINGUEZ, District Judge.

## I. PROCEDURAL HISTORY

The instant case is an antitrust action brought under the Sherman Act, 15 U.S.C. §§ 1 and 3, and is comprised of a compilation of cases sent to this District Court to be handled as a multi-district litigation. The *Fourth Amended Complaint* (Docket No. 501) remains sealed to present day, so the Court shall only briefly outline the relevant facts, and shall restrict itself to those facts which appear in both the original unsealed *Complaint* (Docket No. 1) and the *Fourth Amended Complaint,* as well as information ascertainable from the public docket.

Plaintiffs in the instant case purport to represent a potential class comprised of direct purchasers of waterborne cabotage between Puerto Rico and the United States, its territories and possessions. Plaintiffs purchased the cabotage from Defendants, who are eight[1] companies that provide cabotage services and six individual officers of those companies. Plaintiffs allege that Defendants engaged in a conspiracy to illegally fix waterborne cabotage prices[2] between the U.S. and Puerto Rico which spanned several years. Plaintiffs buttress this allegation with assertions regarding finances of the companies and the market itself as well as assertions based upon the existence of an ongoing criminal investigation by the Department of Justice ("DOJ").

---

1. At the outset of the case, an additional Defendant, Trailer Bridge, Inc., was named. However, the Court has recently granted a motion to dismiss (Docket No. 722) as to this Defendant. Accordingly, the Court shall not consider Trailer Bridge's filings in the instant *Opinion and Order.* Likewise, as Defendants Crowley Maritime Corporation and Crowley Liner Services have at this time filed a settlement agreement between themselves and Plaintiffs and have represented to the Court that they will no longer oppose the approval of other settlement agreements in the instant case (Docket No. 667), the Court shall not directly address their filings herein.

2. "Prices" in this context include both the negotiated costs of shipping and the various surcharges imposed by cabotage providers.

On July 8, 2009, Plaintiffs and Defendants Horizon Lines, Inc., Horizon Lines, LLC, Horizon Logistics Holdings, LLC, Horizon Logistics, LLC and Horizon Lines of Puerto Rico, Inc. (collectively "Horizon Defendants") filed a motion for preliminary approval of a settlement agreement reached between those parties (Docket No. 375). Under the terms of the proposed settlement agreement, Plaintiffs have three options: (1) they may opt out of the class to pursue individual remedies against the Horizon Defendants; (2) they may elect to receive a pro rata share of a $20,000,000 total settlement payment to be made by the Horizon Defendants to Plaintiffs; or (3) they may utilize a base rate freeze on future contracts with the Horizon Defendants. In exchange, Plaintiffs will request the dismissal with prejudice of claims against Horizon Defendants.

On December 11, 2009, Plaintiffs and Defendant Alexander Chisholm (hereinafter "Defendant Chisholm") filed a joint motion for preliminary approval of a settlement agreement reached between these parties (Docket No. 597). Under this agreement, Plaintiffs agree to dismiss the claims against Defendant Chisholm in exchange for his cooperation in the ongoing litigation.

Additionally, on February 5, 2010, Plaintiffs and Defendants Crowley Maritime Corporation and Crowley Liner Services (collectively "Crowley Defendants") filed a motion for preliminary approval of a settlement agreement reached between those parties (Docket No. 680). The terms of the settlement agreement reached between these parties is substantially identical to that reached between Plaintiffs and Horizon Defendants, except that the Crowley Defendants' liability for cash payments shall total $13,750,000 rather than the $20,000,000 figure named in the Horizon Settlement Agreement.

The only remaining party who has filed objections to the Court's preliminary approval of the aforementioned settlement agreements is Defendant Sea Star Lines (hereinafter "Sea Star").[3] Although several of the issues, particularly those related to the notice to be sent to potential members of the Settlement Class members or to discovery, have since been resolved via re-drafting or clarifications made in subsequent filings and in open court, Sea Star continues to emphasize two objections. Namely, Sea Star's objections at this stage are that Plaintiffs have failed to show that the proposed settlement class meets the requirements of Federal Rule of Procedure 23 and that Plaintiffs have not provided evidence that the proposed base rate freeze is competitively neutral.

## II. THE SETTLEMENT CLASS

Federal Rule of Civil Procedure 23 governs antitrust class action suits. *See* FED. R.CIV.P. 23; *see also ABA Section of Antitrust Law, Antitrust Law Developments vol. I* 886 (6th ed.2007). Under both Rule 23(a) and Rule 23(b), Plaintiffs bear the burden of establishing the prerequisites for class certification. *In Re Relafen Antitrust Litig.*, 231 F.R.D. 52, 67 (D.Mass.2005). Under Rule 23(a), Plaintiffs must establish numerosity, commonality, typicality and adequacy of representation. FED.R.CIV.P. 23(a). Further, under Rule 23(b)(3), Plaintiffs must establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED.R.CIV.P. 23(b)(3). These two requirements are commonly known as "predominance" and "superiority." *In Re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 18 (1st Cir.2008).

Although, in the past, courts typically determined whether the aforementioned requirements of Rules 23(a) and (b) were met via a reading of the pleadings, recently, the First Circuit has expressed a strong preference that the Court move beyond the pleadings when certifying a class. *See College of Dental Surgeons of Puerto Rico v. Connecticut General Life Ins. Co.*, 585 F.3d 33, 41 (1st Cir.2009); *see also In Re PolyMedica Corp.*

---

**3.** Early in the litigation, Defendant Leonard Shapiro moved to join Sea Star's motion in opposition to the motion for preliminary approval of the settlement agreement with Horizon Defendants (Docket No. 338).

*Sec. Litig.*, 432 F.3d 1, 6 (1st Cir.2005). Taking into consideration the latest mandates from the First Circuit, the Court has allowed parties to the instant case to present evidence, such as affidavits and expert reports, to support their arguments in favor of or against certification of a settlement class in the instant case. When considering the evidence[4] proffered by parties, the Court has also been cognizant that its duty is to "evaluate the plaintiff's evidence critically without allowing the defendant to turn the class-certification proceeding into an unwieldy trial on the merits." *In Re New Motor Vehicles*, 522 F.3d at 17 (quoting *In Re PolyMedica*, 432 F.3d at 17). Even in the context of certifying a settlement class, the "district court must conduct a rigorous analysis of the prerequisites established by Rule 23 before certifying a class." *Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d 32, 38 (1st Cir. 2003). "[H]owever, despite this heightened scrutiny ... the law favors class action settlements." *In Re Relafen*, 231 F.R.D. at 68 (quoting *In Re Lupron Mktg. And Sales Practices Litig.*, 228 F.R.D. 75, 88 (D.Mass.2005))(internal quotations omitted).

In each of the settlement agreements, the Settlement Class is defined as follows:

> All persons (excluding governmental entities, Defendants, co-conspirators, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing) who purchased Puerto Rican Cabotage directly from any of the Defendants or their co-conspirators, or any present or former parent, subsidiary or affiliate thereof, at any time during the period from May 1, 2002, until April 17, 2008.

Thus, the Court shall analyze the certification of the Settlement Class as it pertains to all the proposed settlement agreements collectively rather than treating each settlement's Settlement Classes as distinct entities.

## A. RULE 23(A) REQUIREMENTS

The Court therefore proceeds first to review the sufficiency of the material presented by Plaintiffs in favor of certification of a settlement class at this preliminary stage under the criteria set forth under Federal Rule of Civil Procedure 23(a).

### 1. NUMEROSITY

■ The numerosity requirement of Rule 23(a) specifically mandates that "the class [be] so numerous that joinder of all members is impracticable." FED.R.CIV.P. 23(a)(1). The Court finds that this numerosity requirement is easily met here. As noted by Plaintiffs' expert, Dr. Lamb, at least 3,000 customers were affected by Defendants' alleged conspiracy. *See Affidavit of Dr. Russell Lamb*, ¶ 4. Joinder of such a multitudinous group of Plaintiffs would clearly be impracticable. Accordingly, the Court finds that the numerosity requirement is met in the instant case.

### 2. COMMONALITY

. The second requirement of Rule 23(a) is that "there are questions of law or fact common to the class." FED.R.CIV.P. 23(a)(2). Only a single common question of fact or law is necessary to meet this requirement. *See Manual for Complex Litigation* § 21.132 (4th ed.2004); *see also* 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.10 (4th ed.2002). Typically, in antitrust cases, "courts have held that the existence of an alleged conspiracy or monopoly is a common issue that will satisfy" the commonality requirement. 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.10 (4th ed.2002); *see also Natchitoches Parish Hosp. Svc. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 264 (D.Mass.2008).

There is considerable overlap between this requirement of commonality and the criteria of typicality and predominance as questions, such as common impact and proof of damages, "are relevant to all three." *In Re New Motor Vehicles*, 522 F.3d at 19 (internal citations omitted); *see also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)(noting that "the pre-

---

**4.** When evaluating the evidence proffered by the parties in favor of or against certification of a settlement class, the Court has employed the preponderance of the evidence standard. *See In Re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir.2009).

dominance criterion is far more demanding" than the commonality criterion). However, the requirement of commonality has been described as a "low bar" as courts typically provide this criteria with "a permissive application." *In Re New Motor Vehicles*, 522 F.3d at 19 (internal citations and quotations omitted). Thus, the commonality requirement is relatively toothless in comparison with the related requirements of typicality and predominance.

■ In the instant case, Plaintiffs have identified seven issues which they allege are common to all Plaintiffs. The first of these is whether Defendants engaged in a conspiracy to allocate customers, rig bids and fix prices.[5] The second issue is the precise identity of the participants in the alleged conspiracy. The third common issue cited by Plaintiffs includes the meetings, communications and other collusive acts allegedly performed by Defendants while perpetrating the conspiracy. The next common issue cited is the duration of the conspiracy. Additionally, Plaintiffs cite the effect of Defendants' conduct on the prices of cabotage and the appropriate measure of damages sustained by Plaintiffs as issues common to all Plaintiffs.

Sea Star makes no claim that Plaintiffs have failed to fulfil the commonality requirement of the class certification analysis. Plaintiffs in the instant case have provided preliminary evidence supporting their allegation that a price-fixing conspiracy existed between Defendants. Even without considering any of the other factors presented by Plaintiffs, the Court finds that the supported allegation regarding the antitrust conspiracy targeting local cabotage purchasers, standing alone, is sufficient to establish commonality. *See* 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.10 (4th ed.2002); *see also Natchitoches*, 247 F.R.D. at 264; *see also In Re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 204 (D.Maine 2003).

### 3. TYPICALITY

■ The third requirement of Rule 23(a), typicality, is satisfied where "the claims or defenses of the representative par-

ties are typical of the claims or defenses of the class." FED.R.CIV.P. 23(a)(3). In assessing this requirement, the Court is directed to focus "less on the relative strengths of the named and unnamed plaintiffs' case than on the similarity of the legal and remedial theories behind their claims." *In Re Relafen*, 231 F.R.D. at 69 (quoting *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir.1986)). The requirement of typicality, like commonality, "does not require that all putative class members share identical claims." *Natchitoches*, 247 F.R.D. at 264 (quoting *In Re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531 (3d Cir.2004)). Rather,

> [t]ypicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct. In other words, where such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to the class, and that wrong includes the wrong to the plaintiff. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.

*Id.* (quoting *In Re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir.1996); *see also* 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.13 (4th ed.2002).

Sea Star contests Plaintiffs assertion that they meet the typicality requirement for class certification. Specifically, their arguments rest upon an averment that Plaintiffs have not provided sufficient details regarding the negotiations held between Plaintiffs and Defendants, the volume of goods transported or the type of goods transported. Further, Sea Star notes that Defendants operated between different ports and using different vessels. On the other hand, Plaintiffs emphasize that they all suffered a common injury in the form of the allegedly anti-competitive pricing structures created by Defendants. Plaintiffs also assert that the allegedly collusive actions undertaken by Defendants man-

5. *See supra* note 2 regarding the relevant definition of "prices."

date that a common set of facts apply to the claims of the entire class.

Both parties' arguments regarding the adequacy requirement rely on expert opinions submitted to the Court. Sea Star's arguments rest primarily upon affidavits and declarations submitted by now-settling Defendants Crowley Liner Services, Inc. and Crowley Maritime Corporation (Docket No. 593), which were subsequently withdrawn when those Defendants reached a settlement agreement with Plaintiffs (Docket No. 728). The Court, however, acting out of an abundance of caution, will continue to consider these submissions herein in order to avoid any unfairness to Sea Star, who originally objected alongside the Crowley Defendants, but who is the only non-settling business entity Defendant remaining at this time. Thus, the Court is faced with a battle of conflicting experts regarding the typicality and predominance requirements for class certification.

■ Although Sea Star urges the Court to deny certification for lack of typicality based upon dissimilarities between Plaintiffs, the Court disagrees with the propriety of such an outcome. After all, typicality is not tantamount to identicality, and the Court need not ascertain whether all Plaintiffs are situated in exactly the same manner as each other in order to find typicality. *See In Re Carbon Black Antitrust Litig.*, No. 03–10191, 2005 WL 102966 at *12 (D.Mass.2005)(finding that the claims of representatives of a proposed class were sufficiently typical, even where they paid for diverse products under a variety of agreements involving varied terms or volumes).

■ Here, Plaintiffs are the purported representatives of a class of natural persons and business entities who purchased cabotage from Defendants during the time period when Defendants allegedly engaged in an illegal price-fixing scheme. Although Sea Star's assertion that the terms and events surrounding their individual contracts with Defendants, the type of vessel upon which their cabotage shipped, the port from which the cabotage shipped and the volume of cabotage shipped vary bears some weight, the Court reads this argument as improperly

mandating identicality, rather than typicality. *See In Re Carbon Black Antitrust Litig.*, 2005 WL 102966 at *12 (finding typicality even where purchasers did not buy identical volumes of a product or under the same contractual terms).

All Plaintiffs and members of the proposed class are entities who purchased cabotage from Defendants at a price which was allegedly inflated to a supra-competitive level by Defendants' alleged anti-competitive price-fixing scheme. Although the exact details of the individual contracts and shipping terms vary between Plaintiffs and Defendants, the claims of Plaintiffs and members of the proposed class all involve the same illegally collusive behavior by Defendants which led to Plaintiffs and members of the proposed class paying supra-competitive prices for cabotage. Thus, Plaintiffs and members of the proposed class share the same legal theory as their claims arise out of the same conduct or practice by Defendants. *See In Re Insurance Brokerage Antitrust Litig.*, 579 F.3d 241, 265 (3d Cir.2009); *see also In Re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 205 (D.Maine 2003). Specifically, "[t]he course of conduct pled in this case is the agreement to fix prices and the legal theory will be a[n antitrust] violation for all class members." *In Re Carbon Black Antitrust Litig.*, 2005 WL 102966 at *12. Accordingly, the Court finds that Plaintiffs' claims are sufficiently typical of those of the Proposed Class to meet this requirement.

## 4. ADEQUACY OF REPRESENTATION

■ The fourth and final requirement of Rule 23(a) is adequacy of representation, under which the Court must determine that "the representative parties will fairly and adequately protect the interests of the class." FED.R.CIV.P. 23(a)(4). This requirement aims to "uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231. Along this vein, it is well established that a class representative must be part of the class and "possess the same interest and suffer the same injury as the class members." *Id.* at 625–26, 117 S.Ct. 2231

(quoting *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977)). The Supreme Court has noted that "[t]he adequacy-of-representation requirement tends to merge with the commonality and typicality criteria ... which serve as guideposts for determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* at 626 n. 20, 117 S.Ct. 2231. This requirement also addresses the adequacy of class counsel, "factor[ing] in [their] competency and conflicts." *Id.*

 As a preliminary matter, the Court finds that class counsel meet the adequacy requirement. Class counsel are properly experienced, have no known conflicts of interest and, in light of the vigorous nature in which they have already pursued the instant case on behalf of Plaintiffs, the Court harbors at this stage no doubt that they can competently pursue both Plaintiffs' claims and those of the entire proposed class. *See e.g. In Re Compact Disc*, 216 F.R.D. at 205 (finding counsel adequate based, in part, upon "the quality of their pleadings, diligence in investigating and prosecuting the matter, and extensive experience").

 Sea Star hotly contests Plaintiffs' adequacy as class representatives, however. Plaintiffs have supplemented their assertions regarding adequacy with affidavits of several named Plaintiffs. Sea Star attacks the sufficiency of these affidavits,[6] calling them overly "sweeping." Further, Sea Star asserts that Plaintiffs have failed to show adequacy as they proffer no evidence that members of the

class know of the litigation or the terms of the settlement agreements, do not show that there is sufficient supervision of counsel by Plaintiffs and that they do not proffer evidence regarding the rates actually paid for cabotage. Plaintiffs, in turn, argue that they have all paid the same illegally inflated rates as members of the Proposed Class and, accordingly, share the common goal of maximizing recovery for the illegally inflated pricing on Puerto Rican cabotage.

As stated above, the adequacy criterium of Rule 23(a) should be read in tandem with the commonality and typicality criteria. As already discussed, the Court finds that Plaintiffs have met these two criteria, based upon the common injury suffered in the form of illegally inflated prices, and a common legal theory based upon Defendants' alleged violations of the Sherman Act. Plaintiffs, like other members of the proposed class, have the same incentives to maximize recovery for the wrongs allegedly perpetrated on them by Defendants. Accordingly, the Court finds that Plaintiffs have suffered the same injury and share the same interest as members of the proposed class.

Although Sea Star attacks the sufficiency of Plaintiffs' showing that they meet the adequacy requirement of 23(a), if the Court were to create precedent by denying the motion for class certification based upon these arguments, it would sanction an untenably heightened standard. In order to rebut Sea Star's assertions of insufficiency, Plaintiffs would have to present the Court with a near-unreachable level of detail as to the alignment of their interests with those of the members of the proposed class. In order to present

---

**6.** Sea Star attached to its *Motion Submitting Documents Pursuant to Court Orders of November 12 and November 13, 2009* (Docket No. 595) evidentiary objections to the affidavits proffered by Plaintiffs. First, Sea Star objects to the affidavit of Defendant Chisholm, asserting that it is unreliable because his settlement agreement with Plaintiffs was, at that time, undisclosed. As it has since been disclosed, the Court finds this argument MOOT. Sea Star then objects to the statements made by Defendant Chisholm in his affidavit as lacking foundation, lacking personal knowledge and unduly prejudicial. The Court OVERRULES these objections. *See e.g. Manual for Complex Litigation* § 21.21 (4th ed.2004)("The judge need not decide at the certification stage whether such expert testimony satisfies standards for admissibility at trial."). Sea Star also objects to the affidavit of Carlos Trigueros, arguing that the affidavit should be stricken in its entirety as it is too vague, and arguing that portions of it should be stricken for lack of foundation and for providing inadmissible opinions on legal issues. The Court OVERRULES these objections. Sea Star also objects to the affidavit of Maria V. Arbelaez, Roberto Medina, Melba J. Jordan, David Klau and Rafael Gonzalez based upon the same grounds. The Court OVERRULES these objections as well for the reasons cited above.

the Court with evidence regarding the proposed class' knowledge of the terms of the settlement agreements and potential conflicts, Plaintiffs would likely need to poll members of the proposed class, other than themselves, who have, to date, not even received notice of the proposed settlements. In fact, such notice shall not be issued until the Court, if it deems fit, later orders that notice of the settlements be sent to potential class members. Even common sense, therefore, dictates that Plaintiffs' request for certification of a settlement class should not be denied due to failure to present such evidence as the possibility of gathering such evidence is stymied by the Court's decision whether or not to grant class certification. To deny class certification based upon an insufficient showing of adequacy for the reasons argued by Sea Star, therefore, might create precedent for cases that would ultimately preclude certification of any large class whose members were not easily identified and polled by their proposed representatives prior to moving for class certification. The Court shall not create such precedent herein. Accordingly, having found that Plaintiffs have the same interest in pursuing a remedy for injuries suffered as a result of Defendants' alleged antitrust price-fixing conspiracy as members of the potential class and that Plaintiffs have no readily ascertainable conflict of interest with members of the proposed class, the Court shall not deny their motion for class certification for lack of adequacy.

## B. RULE 23(B) REQUIREMENTS

As the Court has determined that Plaintiffs meet the requirements for class certification that arise under Rule 23(a), it shall now turn to discuss the predominance and superiority requirements of Rule 23(b).

### 1. PREDOMINANCE

■ Rule 23(b)(3) mandates that, in order to certify a class under that section of the Rule, the Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members." FED.R.CIV.P. 23(b)(3). This "predominance criterion is far more demanding ... than the commonality requirement." *In Re New Motor Vehicles,* 522 F.3d at 20 (quoting *Amchem,* 521 U.S. at 624, 117 S.Ct. 2231)(internal quotations omitted). In antitrust actions, such as the instant action, "common issues do not predominate if the fact of antitrust violation and the fact of antitrust impact cannot be established through common proof." *Id.* However, the Supreme Court has noted that "[p]redominance is a test readily met in certain cases alleging ... violations of the antitrust laws." *Amchem,* 521 U.S. at 625, 117 S.Ct. 2231. Ultimately, this requirement "does not require an entire universe of common issues, but does require a sufficient constellation of them." *In Re Relafen,* 231 F.R.D. at 70 (quoting *Waste Mgt. Holdings, Inc. v. Mowbray,* 208 F.3d 288, 298 (1st Cir.2000))(internal quotations omitted). Accordingly, "[e]ven where there are some individualized damage issues [in a proposed antitrust class action], common issues may predominate when liability can be determined on a class-wide basis." *Natchitoches,* 247 F.R.D. at 269 (quoting *In Re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 139 (2d Cir.2001))(internal quotations omitted).

■ "Section 1 [of the Sherman Act] forbids agreements 'in restraint of trade or commerce among the several states'; [and] section 3 forbids agreements 'in restraint of trade or commerce in any Territory of the United States.'" *Cordova & Simonpietri Insurance Agency, Inc. v. Chase Manhattan Bank N.A.,* 649 F.2d 36, 36 (1st Cir.1981)(quoting 15 U.S.C. §§ 1 & 3). Thus, in order to prevail upon their claims, Plaintiffs must show that a conspiracy existed that unreasonably restrained trade and that affected interstate or interterritory commerce. *See Lee v. Life Ins. Co. of N. America,* 829 F.Supp. 529, 535 (D.R.I.1993), *aff'd* 23 F.3d 14 (1st Cir.1994). For the purposes of a Sherman Act claim, price fixing is usually considered to be *per se*[7] unlawful. *Eastern*

---

7. With respect to the *per se* illegal nature of a price-fixing conspiracy, the First Circuit has stated:

few agreements are deemed so pernicious that they are condemned *'per se'* and without regard to the power of the parties to accomplish their aims, regardless of justification, and with-

*Food Svcs., Inc. v. Pontifical Catholic Univ. Svcs. Assoc.*, 357 F.3d 1, 4 (1st Cir.2004).

Here, Sea Star bases its arguments against class certification for lack of predominance upon several contentions. First, Sea Star argues that Plaintiff's expert, Dr. Lamb, did not establish a presumption of class-wide impact. Sea Star rests this argument upon the assertions of the Crowley Defendants' experts,[8] which, in turn, are based upon evidence that Defendants served the varying needs of their customers via different ports and with different types of vessels. Sea Star also asserts that the Court may not presume common impact simply because the instant case is a horizontal price-fixing conspiracy. Finally, Sea Star challenges the methodology for calculating damages proffered by Dr. Lamb as untested and unworkable. Plaintiffs, in turn, focus on the alleged conspiracy to price-fix and the market-wide effects of that alleged conspiracy, particularly as related to the issues outlined above during the Court's discussion of commonality.

Thus, as to this criterium, the controversy between Sea Star and Plaintiffs centers around the varying opinions of the experts. The Court may not shirk its duties under Rule 23 by citing the necessity of making determinations based upon the credibility of competing experts at this stage. *See In Re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 324 (3d Cir.2009). Rather, the Court must act as finder of fact, making such credibility determinations in order to grant or deny class certification under Rule 23. *Id.* The Court notes that this preliminary credibility determination "does not preclude a different view at the merits stage of the case." *Id.*

It is within the Court's wide discretion to conduct hearings to resolve credibility disputes prior to making its Rule 23 ruling; however, in the instant case, the Court finds that such hearings are unnecessary. *See id.* The Court has received ample evidence from all parties in the form of "affidavits, documents [and] testimony" and bases its conclusions upon a combination thereof. *See id.* Accordingly, the Court's function in determining whether the predominance requirement is fulfilled in the instant case shall be to review the expert reports in order to resolve the disputes that underlie parties' respective positions regarding predominance. *See In Re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 324 (explaining that "[r]esolving expert disputes in order to determine whether a class certification requirement has been met is always a task for the court," even where a credibility determination must be made); *see also In Re New Motor Vehicles*, 522 F.3d at 20. In this manner, the Court shall predict "how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *In Re New Motor Vehicles*, 522 F.3d at 20 (quoting *Mowbray*, 208 F.3d at 298).

### a. DR. RUSSELL L. LAMB

In support of their petition for class certification, Plaintiffs offer the expert opinion of Dr. Russell L. Lamb. In Dr. Lamb's affidavit, he asserts that, due to the highly concentrated nature of the industry, the high barriers to entry into the market, the lack of economically viable substitutes for waterborne cabotage, the stable demand for Puerto Rican cabotage during the class period and the generally substitutable nature of Puerto Rican cabotage between Defendants, the impact on members of the proposed class

out any need to show an actual or potential adverse affect on consumer welfare. The classic cases are agreements to set prices, fix output or engage in horizontal market division ... The categorical descriptions of *per se* offenses are quite misleading for anyone not well versed in antitrust. For example, price-fixing in its literal sense is not considered *per se:* virtually every sale is an agreement on price. **The only price-fixing agreements that are condemned *per se* ... are agreements (1) between competitors (2) as to competing products or services (3) where, in addition, the agreement**
is not part of a larger, legitimate economic venture.
*Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 47 (1st Cir.2001)(internal citations omitted)(emphasis ours).

8. As already stated above, although the Crowley Defendants later withdrew their experts' affidavits, due to fairness considerations and acting out of an abundance of caution, the Court has chosen to review these reports as they relate to Sea Star's arguments against class certification and preliminary approval of the settlement agreements.

may be shown by common proof. *Affidavit of Dr. Lamb,* ¶ 11.

Dr. Lamb rests his assertion regarding market concentration upon figures that show that, between 2002 and 2008, 99.9–100% of the Puerto Rican cabotage market share was held by the original Defendants[9] in the instant action. *Id.,* Tables 1 & 2. These same figures show that the remaining Defendants controlled between 20.6% and 33.5% of the market individually. *Id.* Further, the Herfindahl–Hirschmann Index ("HHI"), which measures the degree of industry concentration, ranked the Puerto Rican Cabotage industry concentration as 2,702 in 2008, a figure that the Department of Justice ("DOJ") considers highly concentrated. *Id.* at ¶ 18. Citing Richard Posner, Dr. Lamb concluded that "the stable market shares here indicate a lack of competition between the defendants." *Id.* at ¶ 18.

In support of his assertion that there are high barriers to entry in the Puerto Rican cabotage market, Dr. Lamb notes that the Jones Act itself acts as a primary barrier. *Id.* at ¶¶ 20–21. Specifically, Dr. Lamb states that the entry barriers created by the Jones Act restrict the possibility of entry into the market by new players due to the necessity of high capital investment and substantial infrastructure investment, as well as long lead times associated with building new containerships. *Id.* at ¶ 21. Further, Dr. Lamb notes that federal regulation of the Puerto Rican cabotage industry also acts as a barrier to entry. *Id.* at ¶ 22.

Dr. Lamb next opines that "[d]emand for ocean freight shipping services is a derived demand, which depends on the demand for the final goods being purchased by the consumer." *Id.* at ¶ 23. Additionally, Dr. Lamb states that there is a large trade imbalance in the Puerto Rican cabotage industry, as imports from the U.S. to Puerto Rico greatly outweigh exports from Puerto Rico to the U.S. *Id.* at ¶ 25. Dr. Lamb also asserts that "[t]he demand for maritime freight shipping services is [generally] characterized by low price elasticity," where static elasticity "means that a price fixing conspiracy could profitably raise price above competition levels." *Id.* at ¶ 24. Further, Dr. Lamb notes that, during the relevant period, "demand for Puerto Rican shipping was static or declining." *Id.* at ¶ 26.

The last assertion upon which Dr. Lamb bases his conclusions is that Defendants' services are interchangeable, a proposition that Sea Star vehemently contests. Dr. Lamb rests this assertion upon several factors. First, Dr. Lamb notes that, because Defendants "generally serve the entire eastern seaboard of the United States," providing services along the "limited number of shipping routes between the U.S. and Puerto Rico," and because each port is served by at least two Defendants, "no single defendant has a monopoly on Cabotage to a geographic market in the U.S. mainland." *Id.* at ¶ 28. Additionally, based upon Defendants' own filings and statements, Dr. Lamb postulates that "[b]ecause defendants offer Cabotage for many different kinds of goods, no defendant has a monopoly in transport of a particular good, and competition occurs on the basis of price rather than some sort of specialized service." *Id.* at ¶ 29. Dr. Lamb also hypothesizes that, based upon the available evidence, "but for the alleged misconduct … more vigorous competition would have served to reduce prices." *Id.* at ¶ 29.

Based upon these assertions, Dr. Lamb reaches several conclusions as to matters which would be shown by common proof as to all class members. First, Dr. Lamb notes that, because the Puerto Rican cabotage industry is highly concentrated, it would have been "impossible for class members to" substitute other services for those provided by Defendants. *Id.* at ¶ 31. Dr. Lamb also states that the effect of a cartel would have been to raise prices to supra-competitive levels. *Id.* at ¶ 32. Whereas under other circumstances, this would lead to the entry of new competitors into the marketplace, the high entry barriers present in the Puerto Rican cabotage market prevented such an occurrence here and, accordingly, Defen-

---

9. The Court notes that Defendant Trailer Bridge, whose motion to dismiss the Court recently granted, held a market shares between 12.5– 15.6%, leaving the remaining Defendants with an 84.3–87.5% market share during the relevant time-period. *Id.* at Tables 1 & 2.

dants were able to raise prices to a supra-competitive level and maintain them at that level throughout the relevant time-period. *Id.* Further, Dr. Lamb postulates that "[b]ecause there are few economically viable substitutes, class members would have had no choice but to purchase Cabotage services at the inflated prices which would have resulted from the alleged misconduct." *Id.* at ¶ 34. Further, Dr. Lamb states that, if not for the alleged conspiracy, because demand for cabotage was stable or even weak during the relevant time-period, Defendants would have competed with each other to gain new customers, which would have resulted in lower cabotage prices. *Id.* at ¶ 35. Thus, Dr. Lamb concludes that the class members were injured as a result of the alleged conspiracy as they had paid supra-competitive prices for Puerto Rican cabotage. *Id.* Dr. Lamb notes that in "industries characterized by static or declining demand," such as the Puerto Rican cabotage industry during the relevant time-period, collusion of the type alleged in the instant action should be relatively easy to detect. *Id.* at ¶ 36. Finally, because each port in the U.S. served by a Defendant was served by another Defendant, Dr. Lamb asserts that Puerto Rican cabotage was substitutable across Defendants, so, in a competitive market, they would have competed against each other, primarily upon the basis of price. *Id.* at ¶ 37. It follows, therefore, that, because price competition did not exist due to the alleged conspiracy, that class members were harmed because they paid a price for cabotage that was inflated in comparison with the price which they would have paid if not for the alleged conspiracy. *Id.* at ¶ 38.

In his affidavit, Dr. Lamb also presents the Court with a proposed methodology for measuring damages on a class-wide basis. This methodology encompasses a two-step process, which Dr. Lamb indicates is typical for cases involving price-fixing. *Id.* at ¶ 39. Under the first step, a model is developed in order to explain the prices to determine which prices were higher as the result of the alleged conspiracy. *Id.* at ¶ 39. In order to calculate this "overcharge," Dr. Lamb proposes to utilize a modified benchmark analysis informed by multiple regression analyses

to account for other factors which affected prices of the cabotage during the relevant time-period. *Id.* at ¶ 40–57. Under the second step of the proposed method for measuring damages, the "overcharge" is applied to the dollar value of sales that occurred so that the Court may determine the class-wide overcharge paid by class members. *Id.* at ¶ 39.

### b. DR. MARK A. ISRAEL

In response to Dr. Lamb's affidavit, Defendants offer the affidavits of two counter-experts. The first of those experts is Dr. Mark A. Israel. His affidavit serves primarily as an attempt to debunk the theories, assertions and opinions set forth by Dr. Lamb in his affidavit, particularly those as to class-wide impact of the alleged conspiracy. *See Affidavit of Dr. Mark A. Israel,* ¶ 8.

First, Dr. Israel notes that the existence of a cartel does not necessarily indicate that members of the cartel "were successful in raising prices to the entirety of the class." *Id.* at ¶ 10. Next, Dr. Israel alleges that Dr. Lamb's emphasis on the high concentration is, standing alone, insufficient to establish class-wide impact. *Id.* at ¶ 12. Further, Dr. Israel emphasizes that the differences between routes, vessels and container types are factors that he believes show that Defendants' services were, in fact, not interchangeable. *Id.* at ¶ 13.

Specifically, Dr. Israel breaks down the "eastern seaboard" described by Dr. Lamb into its component parts, showing that Defendants' businesses cater to varying regions. *Id.* at ¶ 15. Dr. Israel asserts that these variances will require the performance of route-specific analyses in order to determine class-wide impact. *Id.* at ¶ 16. Dr. Israel also argues that the difference in rates for cabotage imported to Puerto Rico from the U.S. and exported to the U.S. from Puerto Rico also weighs against easily determining class-wide impact. *Id.* at ¶¶ 18–19.

Next, Dr. Israel notes that, at least in some cases, travel time for the goods being shipped is a factor that informed customers' decisions when negotiating contracts for Puerto Rican cabotage. *Id.* at ¶¶ 20–21. Additionally, Dr. Israel emphasizes that the

variety in types, sizes and permanency of containers utilized by Defendants played a role in the competition between Defendants for market share. *Id.* at ¶ 24. Therefore, Dr. Israel concludes that "demonstrating class-wide impact across all routes, carriers, and containers with common proof is unlikely" as factors other than price may have informed class members' decisions. *Id.* at ¶ 24.

Dr. Israel then utilizes shipment data provided by the Horizon Defendants to find that such data is "incompatible with class-wide impact." First, Dr. Israel states that this data shows a heterogeneity in price changes across customers, routes and container types which would preclude demonstration of class-wide impact. *Id.* at ¶ 26. Further, upon analysis of the data, Dr. Israel finds that there is no commonality as to rate increases and decreases, either in direction or in magnitude. *Id.* at ¶¶ 26, 34. Dr. Israel then uses this data to rebuke a portion of the affidavit given by Defendant Chisholm, in which he claimed that the alleged price-fixing "impacted almost all pricing within each shipping category." *Id.* at ¶ 32.

Finally, Dr. Israel addresses Dr. Lamb's methodology for estimating damages in a price-fixing case. *Id.* at ¶ 35. Dr. Israel does not contest the properness of the method outlined by Dr. Lamb. *Id.* Rather, he emphasizes that Dr. Lamb did not actually perform the analysis in order to report on the results in his affidavit. *Id.*

### c. DAVID ST. AMAND

Defendants second expert is David St. Amand.[10] Mr. St. Amand's first assertion is that cabotage carriers do not provide a fungible service as they are "not purchased based on 'price alone.'" Affidavit of David St. Amand ¶ 4. Mr. St. Amand further states that a determination of whether cabotage is shipped pursuant to tariff rates "can only be determined through transaction data for each carrier in the trade." *Id.* at ¶ 5. Like Dr. Israel, Mr. St. Amand emphasizes the varied types of ships employed by Defendants, the

various ports serviced by Defendants, and the range of equipment utilized by Defendants. *Id.* at ¶¶ 26–28. Mr. St. Amand also hypothesizes that, if Defendants had offered truly fungible services, "one would expect a much lower range of rates and standard deviation for similar containers moving on the same voyage" than that which is shown in data obtained from Horizon Lines. *Id.* at ¶ 29.

Mr. St. Amand proceeds to note that the impact of the alleged conspiracy would affect north-bound shippers differently than south-bound shippers. *Id.* at ¶ 30. Additionally, Mr. St. Amand notes that some purchasers of cabotage were Non Vessel Operating Common Carriers ("NVOCCs"), who act as brokers for other customers. *Id.* at ¶ 33. Finally, Mr. St. Amand opines that the use of filed tariffs for some shipments impacts pricing, as do surcharges, and claims that Dr. Lamb fails to address these issues in his affidavit. *Id.* at ¶¶ 34–42.

### d. THE COURT'S ANALYSIS

 As the Court was presented with a battle of the experts as to predominance in the instant case, it has resolved the disputes between the experts, making credibility determinations where necessary in order to determine whether the predominance criterium has been met. *See e.g. In Re Hydrogen Peroxide*, 552 F.3d at 324. As an initial matter, the Court notes that it is presented with a horizontal price-fixing claim, which is considered *per se* illegal if, as in the instant case, the conspiracy is between competitors for competing services and serves no legitimate goal. *Augusta News*, 269 F.3d at 47. Defendants in the instant case are providers of Puerto Rican cabotage who allegedly engaged in a price-fixing conspiracy related to the shipment of goods between the U.S. and Puerto Rico. Although Defendants arguably provide a number of distinct yet related services, utilizing several varieties of containers and vessels, under the umbrella of "Puerto Rican cabotage," the Court finds that, under the terms of the alleged conspiracy, the intent was to fix prices generally for Puerto

---

**10.** The Court has already stricken portions of Mr. St. Amand's affidavit under *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), at Docket No. 735. Accordingly, those portions are not discussed herein.

Rican cabotage, a service provided by all Defendants. The Court must thus find that Defendants are competitors who provide the same service to class members. Thus, Plaintiffs have pled and supported, via their expert's affidavit, a *per se* antitrust violation. Consequently, through evidence as to the existence of the conspiracy itself, Plaintiffs could prove the fact of the violation through common proof.

In their affidavits, the experts disagreed as to class members' ability to prove antitrust impact through common proof. The primary disagreements as to impact arise in the affidavits of Dr. Israel and Dr. Lamb. Upon a careful review of the affidavits, the Court finds that Plaintiffs have sufficiently shown by the preponderance of the evidence that the predominance requirement is met here. The Court explains below.

First, it is apparent from the materials submitted that the Puerto Rican cabotage industry is highly concentrated, a state which results in a lack of true competition among market participants. Further, high entry barriers make it difficult for new participants to enter the market. Additionally, the static elasticity during the relevant time-period indicates that a conspiracy, such as that alleged here, could impose supra-competitive [11] prices on purchasers of Puerto Rican cabotage.

Additionally, Defendants service the eastern seaboard, and no Defendant holds a true monopoly in any one city. Thus, competition is based largely upon price for various cabotage services. Although there are some mixed variables, such as vessel type and container type, the Court will not hold that these variables are sufficient to defeat a finding of predominance here. Plaintiffs and other class members have alleged and shown through circumstantial evidence that, because they had no economically viable substitute for the various Puerto Rican cabotage services provided by Defendants, they paid supra-competitive prices for the services purchased.

At trial, Defendants might submit evidence that not every Plaintiff or class member suffered identically the impact of these supra-competitive prices, as those pertaining to various sub-groups of cabotage services may have borne a lesser or greater impact from the conspiracy. However, once again, the Court's inquiry here is not whether all potential class members are identically situated, but, rather, whether the issues, particularly those pertaining to the violation and to impact, which are common to all class members predominate over those which are not. *See e.g. Kohen v. Pacific Invest. Mgt. Co. LLC*, 571 F.3d 672, 678 (7th Cir.2009)(upholding the grant of class certification even where "some of the class members probably were net gainers"). Although class members may have purchased slightly varying forms of cabotage from Defendants, the Court holds that common issues predominate here. Although Sea Star appears to argue that the Court must find a galaxy, or even a universe, of common issues in order to find that the predominance requirement is satisfied, the Court need only find a constellation. *See In Re Relafen*, 231 F.R.D. at 70. Accordingly, the Court finds that both an antitrust violation and an antitrust impact may be shown through common proof as to the class; thus, the predominance requirement is met.

Further, Dr. Lamb has set forth a reputable and workable model for determining damages as to individual class members in his affidavit. The Court emphasizes that there is no requirement that Plaintiffs present the Court with a detailed accounting of the damages suffered by each class member at this phase. Thus, the Court finds that Plaintiffs have set forth a damages assessment model which takes into account the individualized damage issues that pertain to class members. Therefore, at this initial stage and despite Defendants' expert's assertions to the contrary, the Court will not find that Plaintiffs have failed to establish predominance based upon Dr. Lamb's damages model.

---

11. This is not to say that prices might not have fluctuated both up and down during the relevant time-period. Rather, the Court simply notes that supra-competitive prices were possible during that time, whether those prices increased or decreased from one year to another.

## 2. SUPERIORITY

██ Rule 23(b) also sets forth a requirement that "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R.CIV.P. 23(b)(3). This superiority requirement is designed to ensure that the class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615, 117 S.Ct. 2231. In this manner, the Rule aims to provide for the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court." *Id.* at 617, 117 S.Ct. 2231 (internal quotation omitted). Further, the Rule itself provides a non-exhaustive list of factors which the Court may consider in determining whether the requirement of superiority is fulfilled:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

FED.R.CIV.P. 23(b)(3).

██ Sea Star does not object to a finding that Plaintiffs have met the second prong of the Rule 23(b)(3) inquiry. The proposed settlements in the instant case will present a solution to the claims of a sizeable group of direct purchasers of Puerto Rican cabotage against the majority of the Defendants in the instant case. Because the case is being settled at an early phase, this will save class members large sums in litigation expenses and also represents an exercise in judicial economy. Further, the use of a class for settlement purposes here allows smaller purchasers to pursue complex antitrust claims which they otherwise might not have the resources to pursue. Accordingly, the Court finds that the superiority requirement of Rule 23(b)(3) is met. Thus, having determined that all the requirements for certifica-

tion of a settlement class have been met, the Court hereby **GRANTS** Plaintiffs' motion to certify a settlement class as defined above.

## III. PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENTS

██ The fundamental duty of the Court when it reviews a settlement agreement for approval is to determine whether the proposed settlement is "fair, reasonable and adequate." *See* Fed.R.Civ.P. 23(e)(2); *see also In Re Relafen Antitrust Litig.*, 360 F.Supp.2d 166, 192 (D.Mass.2005). At the preliminary approval stage, the Court need not make a final determination regarding the fairness, reasonableness and adequateness of a proposed settlement; rather, the Court need only determine whether it falls within the range of possible approval. *Scott v. First Am. Title Ins. Co.*, No. 06–286, 2008 WL 4820498 at *3 (D.N.H.2008); *see In Re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534–35 (3d Cir.2004); *see also Colella v. Univ. of Pittsburgh*, 569 F.Supp.2d 525, 527 (W.D.Pa.2008). An illegal or collusive settlement agreement will not fall within the range of possible approval. *See Scott*, 2008 WL 4820498 at *3.

██ For the purposes of assessing the appropriateness of preliminary approval of the settlement agreements reached in the instant case, the Court has adopted the standard set forth by the Third Circuit in *In Re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir.1995), and applied by the District Court for the District of Massachusetts in *In Re Lupron Market. And Sales Prac. Litig.*, 345 F.Supp.2d 135, 137 (D.Mass.2004). Under the standard set forth in these cases, where the Court makes four findings, "a presumption of fairness attaches to the court's determination" and preliminary approval is appropriate. *In Re Lupron*, 345 F.Supp.2d at 137 (quoting *In Re General Motors*, 55 F.3d at 785)(internal quotations omitted). Those four findings are that: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *Id.*

The negotiations for settlement in the instant case were long and arduous, spanning a considerable time-period. Further, the settlement agreements were reached after a great deal of dispute between parties as to the terms of the agreements. Accordingly, the Court finds that the negotiation of the settlement agreements indeed occurred at arm's length. Further, the Court finds that parties were sufficiently informed by the limited discovery which has occurred in the instant case. Plaintiffs have received information pursuant to the criminal proceedings related to the instant case, as well as information given by Mr. Chisholm. Further, Plaintiffs have been able to probe into Settling Defendants' ability to make payments to fulfill the terms of the settlement agreements. Thus, the Court finds that sufficient discovery occurred to weigh towards finding the terms of the settlement agreements to be fair. Further, having reviewed the curricula vitae of Plaintiffs' counsel, the Court is sufficiently convinced that the proponents of the settlement are experienced in similar litigation.

The fourth factor, however, is not so easily assessed here. At this time, the Court cannot ascertain what percentage of the class objects to the terms of the settlement agreements. Nevertheless, the ability of class members to object rests upon the Court's certification of a settlement class, preliminary approval of the settlement agreements and approval of notice to be sent to class members. Thus, the Court does not find that the lack of information as to objectors within the class weighs against preliminary approval of the settlement agreements.

The primary disagreement between Sea Star and Plaintiffs at this stage relates to the so-called "base rate freeze" provision included in the Crowley and Horizon settlement agreements. Under the terms of those settlement agreements, class members would be given the choice of opting for either a base rate freeze on contracts with Settling Defendants or a cash payout. Sea Star asserts [12] that the "base rate freeze" is illegal and places the judicial imprimatur upon a deal which would act to "distort" competition in the cabotage industry.

Sea Star rests its argument against preliminary approval of the Crowley and Horizon settlement agreements upon the case of *In Re Microsoft Corp. Antitrust Litig.*, 185 F.Supp.2d 519(D.Md.2002). Specifically, in its most recent motion, Sea Star reads this case to require that Plaintiffs show that the settlement agreements do not have a "potential adverse impact upon competition." In that MDL, the District Court for the District of Maryland was asked to approve a settlement agreement under which Microsoft was released from the claims of a nationwide settlement class in return for making contributions to a foundation that, once established, would provide computer technology to impoverished schools. *Id.* at 521. Notably, in that case, class members had no right to personally receive any payments from the settlement; thus, class members' only options were to opt out or to agree to fund the foundation with the proceeds of the settlement agreement. *Id.* The Court denied preliminary approval, holding first that the record was insufficiently developed for the court to value the class claims to determine the adequacy of the settlement, then holding that the foundation which was to be created under the settlement agreement was critically underfunded. *Id.* at 528. The Court noted that it had concerns regarding the settlement's potential adverse impact upon competition, as, because of the foundation's underfunding, it could well serve to "provide a means for flooding a [market] .... in which Microsoft has not traditionally been the strongest player." *Id.*

Although Sea Star reads this case to generally forbid preliminary approval of a settlement offer where any negative impact upon competition might hypothetically occur, the Court reads it more narrowly. The Court finds that *In Re Microsoft* does not forbid approval of any settlement agreement which might affect competition, but, rather, cau-

---

**12.** The Court notes that Sea Star's assertions regarding the impact of the base-rate freeze were based upon opinions of Mr. David St. Amand which were stricken from the record at Docket No. 735 when the Court found him utterly unqualified to give testimony as to antitrust economics.

tions against approval of an agreement which allows the settling defendant to use the agreement to its advantage in entering a market in which it was previously not a strong competitor. The Court believes to find otherwise would run afoul of the basic principle that antitrust laws in the United States exist not to protect competitors, but, rather, to protect competition itself as it would serve to protect the market shares of individual competitors rather than ensuring the maintenance of healthy, robust competition in the marketplace. *See e.g. Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488–89, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The *In Re Microsoft* court itself noted that, if the foundation were better funded, its concerns regarding competition might be alleviated as Microsoft would then be in a position of competing with other software manufacturers, rather than dominating the market supplied by the foundation. *In Re Microsoft,* 185 F.Supp.2d at 529. Thus, although, in some cases, such as in *In Re Microsoft,* the Court might find that the terms of a settlement agreement allow a settling defendant an unreasonable advantage, in cases where a settlement agreement still allows competitors to continue to compete with the settling defendant, the Court finds no convincing reason for refusal to approve the settlement agreement.

In the instant case, Sea Star retains the option of competing with the prices set by the two-year base rate freeze under the terms of the settlement agreements. Further, purchasers of Puerto Rican cabotage frequently utilize a number of carriers at any given time and are not required to sign exclusive contracts with Settling Defendants in order to opt for the base rate freeze. Further, class members will have the option of electing a cash payout from the funds established by the Crowley and Horizon Defendants' settlement agreements, entirely forsaking the base rate freeze option. Under these circumstances, the Court does not find that the settlement agreements are outside of the range of possible approval. Thus, the Court **GRANTS** preliminary approval to the Crowley and Horizon settlement agreements. Both parties, however, are invited to brief the base rate freeze issue further prior to the

final hearing regarding settlement approval pursuant to the deadlines set forth below. Further, the Court finds that the negotiation of the Chisholm settlement agreement falls within the range of possible approval, **GRANTS** preliminary approval and shall hear any further arguments for or against approval of this settlement agreement at the final fairness hearing.

## IV. NOTICE

The Federal Rules of Civil Procedure dictate that the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." FED. R.CIV.P. 23(e)(1). Having reviewed the proposed notices to class members submitted by Plaintiffs and Settling Defendants (Docket Nos. 680, 743 & 746), the Court finds that the proposed notices are reasonable.

Thus, the Court adopts by reference the proposed orders submitted at Docket Nos. 680, 743 and 746 regarding the procedure for ensuring that class members receive notice of the settlement agreements, as well as the time and place of the **FINAL FAIRNESS HEARING** regarding approval of the settlement agreements, which is to be held on **OCTOBER 26, 2010 at 9:00 AM.**

Class members shall be mailed notice of each settlement agreement within twenty (20) days of entry of this order. Five (5) days after notice is mailed, notice shall be published in the newspapers listed in parties' proposed orders at Docket Nos. 680, 743 and 746. Thereafter, class members shall be provided sixty (60) days in which to submit notice that they will be opting out of the class, object to the terms of the settlement agreement or to submit a proof of claim form where applicable.

## V. CONCLUSION

The Court hereby **GRANTS CERTIFICATION OF THE SETTLEMENT CLASS** (Docket Nos. 449, 597 & 680) and **GRANTS PRELIMINARY APPROVAL** to the Chisholm, Crowley and Horizon Settlement Agreements (Docket Nos. 375, 597 & 680). Notice shall be given to class members in the manner described above and in the proposed

orders submitted at Docket Nos. 680, 743 and 746. The **FINAL FAIRNESS HEARING** is hereby set for **OCTOBER 26, 2010 at 9:00 AM.** Any further briefs regarding the base rate freeze to be submitted by Plaintiffs or Non–Settling Defendants are due on or before **October 1, 2010.** Any response brief regarding the base rate freeze is due on or before **October 15, 2010.**

**IT IS SO ORDERED.**